## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| STEVE FORD, INDIVIDUALLY, AND<br>ON BEHALF OF ALL OTHERS<br>SIMILARLY SITUATED, | * | |
| | * | |
| Plaintiff, | * | |
| v. | * | Civ. No. DLB-23-2156 |
| GENESIS FINANCIAL<br>SOLUTIONS, INC., *et al.*, | * | |
| | * | |
| Defendants. | | |

## MEMORANDUM OPINION

In this purported class action, Steve Ford claims that Genesis Financial Solutions, Inc. ("Genesis") and Spring Oaks Capital SPV, LLC ("Spring Oaks") marketed and collected on credit card loans and acted as lenders without the required licenses in violation of the Maryland Credit Service Business Act, Md. Code Ann., Com. Law § 14-1901 *et seq*., and the Maryland Consumer Loan Law, Md. Code Ann., Com. Law § 12-301 *et seq*. ECF 2. On behalf of a class of similarly situated consumers, Ford seeks damages and a declaration that the loans are void and unenforceable. The defendants have moved to dismiss and compel arbitration. ECF 9, 9-1. The motion is fully briefed. ECF 11, 15, 20, 21. No hearing is necessary. *See* Loc. R. 105.6. For the following reasons, the Court denies the motion.

## I.      Background

Steve Ford is a resident of Maryland who applied for and received a credit card loan from Genesis, a subprime credit card loan originator. ECF 2, ¶¶ 29–30, 34. Genesis markets credit cards to consumers, underwrites the loan applications for the cards, approves loan applications and extensions of credit, and collects payments on the loans. *Id.* ¶ 36. According to Ford, Genesis is

not a chartered bank and therefore "is subject to state usury laws which limit the amount of interest and fees that can be collected on loans." *Id.* ¶ 3. To evade these limits, Genesis has devised a work around: third-party banks issue the loans and then Genesis immediately purchases them. *Id.* ¶¶ 4, 37. This arrangement, Ford claims, makes Genesis a loan broker, because the company assists consumers like Ford in obtaining these third-party loans. *Id.* ¶ 4. Under Maryland law, loan brokers must be licensed. *Id.* ¶¶ 5–6. Genesis is not. *Id.* ¶ 11. So on Ford's account, Genesis is in violation of Maryland law. Ford also alleges Genesis collects on the loans it helps originate. *Id.* ¶¶ 34–36. This too, he claims, violates Maryland law, because entities that "arrange and collect on loans" must be licensed as well. *Id.* ¶ 7.

On June 23, 2019, Genesis opened Ford's account through one of its "third party financial partners" and mailed him the underlying credit card and the Genesis Credit Account Agreement ("the Credit Agreement"), which governs the terms of the card's use. *Id.* ¶¶ 119–20; ECF 9-4. The Credit Agreement was accompanied by a cover letter bearing Genesis letterhead. ECF 9-4, at 1–2. Even though Genesis mailed the agreement and placed its name in the title of the agreement, the Credit Agreement defines "we" as First Electronic Bank, not Genesis. ECF 9-4, at 2.

The Credit Agreement is a three-and-a-half page, single-spaced document that establishes the parties' rights and obligations. *See id.* The agreement becomes operative upon the cardholder's receipt and use of the credit card or the approval of the application, whichever is earlier. *Id.* Three provisions are relevant to the pending motion.

First is the "Arbitration of Disputes Provision." *Id.* at 4. It states, in relevant part:

PLEASE READ THIS ARBITRATION OF DISPUTES PROVISION CAREFULLY. UNLESS YOU SEND US THE REJECTION NOTICE DESCRIBED BELOW, THIS PROVISION WILL APPLY TO YOUR ACCOUNT, AND MOST DISPUTES BETWEEN YOU AND US WILL BE SUBJECT TO INDIVIDUAL ARBITRATION. THIS MEANS THAT: (1) NEITHER A COURT NOR A JURY WILL RESOLVE ANY SUCH DISPUTE;

(2) YOU WILL NOT BE ABLE TO PARTICIPATE IN A CLASS ACTION OR SIMILAR PROCEEDING; (3) LESS INFORMATION WILL BE AVAILABLE; AND (4) APPEAL RIGHTS WILL BE LIMITED

. . . .

This provision replaces any existing arbitration provision with us and will stay in force no matter what happens to your Account, including the closing of your Account. Except as expressly provided below, you and we must arbitrate individually, by binding arbitration under the Federal Arbitration Act ("FAA"), any dispute or claim between you, any joint Accountholder and/or Authorized User, on the one hand, and us, our affiliates and agents, on the other hand, if the dispute or claim arises out of or is related to (a) this Agreement (including without limitation, any dispute over the validity of this Agreement to arbitrate disputes or of this entire Agreement), or (b) your Account, or (c) any relationship resulting from this Agreement, or (d) any insurance or other service related to your Account, or (e) any other agreement related to your Account (including prior agreements) or any such service, or (f) breach of this Agreement or any other such agreement, whether based on statute, contract, tort or any other legal theory (any 'Claim"). However, we will not require you to arbitrate any individual Claims in small claims court or your state's equivalent court, so long as it remains an individual case in that court.

YOU AGREE NOT TO PARTICIPATE IN A CLASS, REPRESENTATIVE OR PRIVATE ATTORNEY GENERAL ACTION AGAINST US IN COURT OR ARBITRATION. ALSO, YOU MAY NOT BRING CLAIMS AGAINST US ON BEHALF OF ANY ACCOUNTHOLDER WHO IS NOT A JOINT ACCOUNTHOLDER WITH YOU OR AN AUTHORIZED USER ON YOUR ACCOUNT (AN 'UNRELATED ACCOUNTHOLDER"), AND YOU AGREE THAT NO UNRELATED ACCOUNTHOLDER MAY BRING ANY CLAIMS AGAINST US ON YOUR BEHALF. CLAIMS BY YOU AND AN UNRELATED ACCOUNTHOLDER MAY NOT BE JOINED IN A SINGLE ARBITRATION. THE ARBITRATOR WILL NOT HAVE THE POWER TO CONSIDER SUCH CLASS, REPRESENTATIVE OR PRIVATE ATTORNEY GENERAL ACTIONS OR ANY SUCH CLAIMS YOU BRING ON BEHALF OF AN UNRELATED ACCOUNTHOLDER.

. . . .

*Id*. The Court refers to this provision as the "arbitration clause."

Next is the "Change of Terms" clause, which states:

Subject to the limitations of applicable law, we may, at any time, change or remove any of the terms and conditions of, or add new terms and conditions to, this Agreement. If required by applicable law, we will mail written notice of such a change to you in the manner required by such law. As of the effective date, the

changed or new terms will apply to new purchases and to the outstanding balance of your Account, subject to the limitations of applicable law.

*Id.* at 3–4. The Court refers to this provision as the "change clause."

Finally, the "Governing Law" clause states:

Except as expressly set forth in the Arbitration of Disputes Provision in the Agreement, this Agreement and the interpretation and enforcement thereof (including but not limited to the exportation of interest rates) will be governed by Federal law that applies to us, and to the extent not preempted by Federal law, the laws of the State of Utah, without regard to its conflicts of law provisions and principles. If there is any conflict between any of the terms and conditions of this Agreement and applicable Federal or State law, this Agreement will be considered changed to the extent necessary to comply with the applicable law.

*Id.* at 4. The Court refers to this provision as the "choice-of-law clause."

Ford received the credit card and made two purchases with the card. ECF 2, ¶ 119; ECF 9-2, ¶ 5. In July 2020, First Electronic Bank conveyed the account and the underlying receivables to Genesis FS Card Services, Inc, a wholly owned subsidiary of Genesis. ECF 9-6; ECF 9-2, ¶ 1. After a series of additional transactions, Spring Oaks became the owner of Ford's debt. ECF 2, ¶¶ 31, 125–127.

In July 2023, Ford filed suit in state court, on behalf of himself and a purported class, seeking damages and a declaration that the loan agreements Genesis executed with class members are "void and unenforceable." *Id.* at 33. The defendants removed the action to this Court. ECF 1. Then the defendants moved to dismiss and compel arbitration based on the arbitration clause. ECF 9. Ford opposed the motion. ECF 11. The defendants replied. ECF 15. Ford filed a surreply with the consent of the defendants, ECF 20, and the defendants responded, ECF 21.

## II.    Standard of Review

Under the Federal Arbitration Act ("FAA"), a party to an arbitration agreement may ask the Court "to move . . . an arbitrable dispute out of court and into arbitration as quickly and easily as possible" by either staying the litigation or compelling arbitration. *Moses H. Cone Mem'l Hosp.*

*v. Mercury Constr. Corp.*, 460 U.S. 1, 22 (1983) (citing 9 U.S.C. §§ 3–4). A motion to compel arbitration "call[s] for an expeditious and summary hearing, with only restricted inquiry into factual issues." *Id.*; *see also* 9 U.S.C. § 4 ("If the making of the arbitration agreement . . . [is] in issue, the court shall proceed summarily to the trial thereof.").

"Motions to compel arbitration exist in the netherworld between a motion to dismiss and a motion for summary judgment." *PC Constr. Co. v. City of Salisbury*, 871 F. Supp. 2d 475, 477–78 (D. Md. 2012). When, as here, the formation of an arbitration agreement is in dispute, "[t]reating [the] motion to compel arbitration as a motion for summary judgment is proper." *Cherdak v. ACT, Inc.*, 437 F. Supp. 3d 442, 454 (D. Md. 2020) (quoting *Caire v. Conifer Value Based Care, LLC*, 982 F. Supp. 2d 582, 589 (D. Md. 2013)); *see Berkeley Cnty. Sch. Dist. v. Hub Int'l Ltd.*, 944 F.3d 225, 233–34 (4th Cir. 2019) ("To decide whether 'sufficient facts' support a party's denial of an agreement to arbitrate, the district court is obliged to employ a standard such as the summary judgment test."). In this context, "the court is entitled to consider materials other than the complaint and its supporting documents." *Berkeley Cnty. Sch. Dist.*, 944 F.3d at 233.

## III.   Discussion

To prevail on a motion to compel arbitration, a party must show:

(1) the existence of a dispute between the parties, (2) a written agreement that includes an arbitration provision which purports to cover the dispute, (3) the relationship of the transaction, which is evidenced by the agreement, to interstate or foreign commerce, and (4) the failure, neglect or refusal of the defendant to arbitrate the dispute.

*Adkins v. Lab. Ready, Inc.*, 303 F.3d 496, 500–01 (4th Cir. 2002) (quoting *Whiteside v. Teltech Corp.*, 940 F.2d 99, 102 (4th Cir. 1991)). The parties dispute whether they formed a written agreement to arbitrate. "Whether a party has agreed to arbitrate an issue is a matter of contract interpretation[.]" *Levin v. Alms & Assocs.*, 634 F.3d 260, 266 (4th Cir. 2011). "Although federal

law governs the arbitrability of disputes, ordinary state-law principles resolve issues regarding the formation of contracts." *Am. Gen. Life & Acc. Ins. Co. v. Wood*, 429 F.3d 83, 87 (4th Cir. 2005).

The parties disagree about which state's law governs the formation of the contract. The defendants insist that to answer that question, the Court should look to the Credit Agreement's choice-of-law clause. The choice-of-law clause provides, in relevant part, that the

> [a]greement and the interpretation and enforcement thereof (including but not limited to the exportation of interest rates) will be governed by Federal law that applies to us, and to the extent not preempted by Federal law, the laws of the State of Utah, without regard to its conflicts of law provisions and principles.

ECF 9-4, at 4. By its own terms, then, the choice-of-law clause presupposes an enforceable agreement exists. For that reason, the Court cannot enforce the choice-of-law clause unless and until the Court determines whether an arbitration agreement exists. *See Johnson v. Cont'l Fin. Co., LLC*, No. PX-22-2001, 2023 WL 5804281, at *3 (D. Md. Sept. 7, 2023) (holding that a choice-of-law clause cannot be applied "until the Court determines whether the Arbitration Provision was ever formed"); *Bailey v. Mercury Fin., LLC*, No. DKC-23-827, 2023 WL 6244591, at *4 (D. Md. Sept. 26, 2023) (applying Maryland law to determine the question of formation despite choice-of-law provision electing South Dakota law); *James v. Synovus Bank*, No. TDC-19-1137, 2020 WL 1479115, at *2 (D. Md. Mar. 26, 2020) (observing that "it is inappropriate to apply a term of the contract to the question of whether the parties agreed to the contract in the first place"); *Archer W. Contractors, LLC v. Synalloy Fabrication, LLC*, No. CCB-14-3031, 2016 WL 930965, at *4 (D. Md. Mar. 11, 2016) (stating a "choice-of-law provision is not . . . applicable to the question of whether a contract was formed, as application of the provision presupposes an enforceable contract").

In the face of this authority, the defendants insist that Maryland law requires the Court to consider the choice-of-law clause to determine whether the agreement to arbitrate was formed

because the Maryland Supreme Court held as much in another case about a credit card agreement, *Jackson v. Pasadena Receivables, Inc.*, 921 A.2d 799 (Md. 2007). *Jackson*, they claim, "holds that a choice-of-law provision is generally applicable in deciding contract formation issues." ECF 15, at 4. They are incorrect. *Jackson* did not concern formation at all. *See Jackson*, 921 A.2d at 802–03.

In *Jackson*, the plaintiff's credit card company sought to recover on a judgment against her for $5,146 in credit card debt. *Id.* at 799. In response, the plaintiff argued that "all of the finance charges that had ever been assessed during the nine years that she used the credit card were forfeited." *Id.* Under a provision of the Maryland Retail Credit Accounts Law, a credit card company could not impose "finance charge[s]" on the cardholder unless the cardholder signed the credit card agreement. *Id.* at 799–800. The plaintiff alleged that although she had used the credit card, she had never signed the agreement. *Id.* at 799. The agreement contained a choice-of-law clause electing South Dakota law. *Id.* at 800. Under South Dakota law, the plaintiff's signature on the agreement was not required. *Id.* at 802. To determine whether the credit card company had forfeited the charges, the Maryland Supreme Court had to decide whether the agreement's choice-of-law clause was valid. *Id.* at 802–03. The court held that it was. *Id.* at 808.

Crucially, there was no dispute that the agreement had been *formed*; the question was whether the agreement was *valid*. *See id.* at 802–03. The formation question asks whether the elements of a contract—offer, acceptance, and consideration—existed. *See Peer v. First Fed. Sav. & Loan Ass'n of Cumberland*, 331 A.2d 299, 301 (Md. 1975); *see also Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287, 296 (2010) (stating that "[w]hen deciding whether the parties agreed to arbitrate a certain matter . . . courts generally . . . should apply ordinary . . . principles that govern the formation of contracts"). The validity question asks whether the parties may be

held to the terms of their agreement. *See, e.g.*, *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 443 (2006) (analyzing a contract challenged as invalid for violating state law); *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 399 (1967) (analyzing a contract challenged as invalid because it was fraudulently induced). *Jackson* stands for the proposition that once a contract is formed, the law elected in its choice-of-law clause governs disputes over its validity. *See, e.g.*, *Cunningham v. Feinberg*, 107 A.3d 1194, 1204 (Md. 2015). *Jackson* does not stand for the proposition, as the defendants claim, that a choice-of-law clause controls questions of formation. Thus, here the choice-of-law clause does not determine which state's law governs the formation of the arbitration agreement.

The Court applies Maryland's choice-of-law rules to determine which state's law governs the contract formation question. *See Francis v. Allstate Ins. Co.*, 709 F.3d 362, 369 (4th Cir. 2013). In Maryland, the law of the state "where the last act is performed which makes an agreement a binding contract" governs. *Grain Dealers Mut. Ins. Co. v. Van Buskirk*, 215 A.2d 467, 471 (Md. 1965); *Fletcher v. Didlake, Inc.*, No. PWG-20-3446, 2021 WL 3418835, at *7 n.4 (D. Md. Aug. 5, 2021) (quoting *Van Buskirk*, 215 A.2d at 471). Ford accepted the Credit Agreement and used the card in the Maryland. ECF 2, ¶ 119. So Maryland law governs the question of contract formation.

Under Maryland law, an agreement to arbitrate disputes is enforceable only if it is a properly formed contract. *See Noohi v. Toll Bros., Inc.*, 708 F.3d 599, 603–04, 607 (4th Cir. 2013) (citing *Cheek v. United Healthcare of the Mid-Atl., Inc.*, 835 A.2d 656(Md. 2003)). "Under Maryland law, 'the formation of a contract requires mutual assent (offer and acceptance), an agreement definite in its terms, and sufficient consideration.'" *Spaulding v. Wells Fargo Bank, N.A.*, 714 F.3d 769, 777 (4th Cir. 2013) (quoting *CTI/DC, Inc. v. Selective Ins. Co.*, 392 F.3d 114,

123 (4th Cir. 2004)). Courts applying Maryland law analyze arbitration clauses within broader contracts as a "severable contract that must be supported by adequate consideration." *Noohi*, 708 F.3d at 603.[1] Consideration exists if "a performance or a return promise [is] bargained for," and "[a] performance is bargained for if it is sought by the promisor in exchange for his . . . promise and is given by the promisee in exchange for that promise." *Pettiford v. Next Generation Tr. Serv.*, 226 A.3d 15, 27 (Md. 2020) (quoting *Chernick v. Chernick*, 610 A.2d 770, 774 (Md. 1992)). A promise is illusory, and so does not provide consideration, if "the promisor retains an unlimited right to decide later the nature or extent of his performance." *Cheek*, 835 A.2d at 662 (quoting 1 Williston, Contracts § 4:24 (4th ed. 1990)).

Maryland "follows the objective interpretation principle," which "give[s] effect to [the] plain meaning" of unambiguous language without delving "into what the parties may have subjectively intended." *Coady v. Nationwide Motor Sales Corp.*, 32 F.4th 288, 291 (4th Cir. 2022) (quoting *Rourke v. Amchem Prods., Inc.*, 863 A.2d 926, 941 (Md. 2004)). Accordingly, "only the intention of the parties as expressed in the language of the contract controls the analysis." *Id.* (quoting *Cain v. Midland Funding, LLC*, 156 A.3d 807, 815 (Md. 2017)). To interpret a contract's language, courts read the entirety of the contract harmoniously. *Credible Behavioral Health, Inc. v. Johnson*, 220 A.3d 303, 312 (Md. 2019); *see also Dumbarton Improvement Ass'n v. Druid Ridge Cemetery Co.*, 73 A.3d 224, 232–33 (Md. 2013). Therefore, the court typically "do[es] not read each clause or provision separately." *Schneider Elec. Bldgs. Critical Sys., Inc. v. W. Sur. Co.*, 165 A.3d 485, 490 (Md. 2017). These rules apply to contract formation and the analysis of whether a

---

[1] The defendants argue that the FAA may preempt *Cheek*'s holding that an arbitration agreement in a broader contract must be supported by independent consideration. *See* ECF 15, at 12–13. The Fourth Circuit held in *Noohi v. Toll Bros., Inc.*, 708 F.3d 599, 612 (4th Cir. 2013), that the FAA does not preempt *Cheek*'s holding.

promise was illusory. *See id.*; *see also Turner v. Jones*, No. 2062, Sept. Term, 2021, 2022 WL 17750356, at *12–13 (Md. App. Ct. Dec. 19, 2022) ("Maryland follows an objective theory of interpretation when determining the existence of a contract.") (citing *Rourke*, 863 A.2d at 941).

The parties dispute whether there was consideration for the arbitration agreement. To answer that question, the Court looks to the Credit Agreement's arbitration clause. *See Cheek*, 835 A.2d at 664. The arbitration clause states, in relevant part:

> [Y]ou and we must arbitrate individually, by binding arbitration under the Federal Arbitration Act ("FAA"), any dispute or claim between you . . . and us . . . if the dispute or claim arises out of or is related to (a) this Agreement (including without limitation, any dispute over the validity of this Agreement to arbitrate disputes or of this entire Agreement), or (b) your Account, or (c) any relationship resulting from this Agreement, or (d) any insurance or other service related to your Account, or (e) any other agreement related to your Account (including prior agreements) or any such service, or (i) breach of this Agreement or any other such agreement, whether based on statute, contract, tort or any other legal theory.

ECF 9-4, at 4. In isolation, this mutual promise to arbitrate is sufficient consideration. *See Holmes v. Coverall N. Am., Inc.*, 649 A.2d 365, 371 (Md. 1994). But the analysis does not end there, because the arbitration clause may not operate in isolation.

The parties agree the arbitration clause is subject to the terms of another provision of the Credit Agreement: the change clause.[2] They are correct. When an arbitration clause is situated within a broader contract, courts, in certain circumstances, consider clauses from the larger contract as part of the parties' agreement to arbitrate. *See, e.g.*, *Harby ex rel. Brooks v. Wachovia Bank, N.A.*, 915 A.2d 462, 468–71 (Md. App. Ct. 2007); *Coady*, 32 F.4th at 292; *Johnson*, 2023 WL 5804281, at *5. Often, this occurs when the arbitration clause or a signed acknowledgment of the arbitration clause explicitly refers to the additional clause at issue. *See, e.g.*, *Cheek*, 835 A.2d

---

[2] The defendants do not dispute that the Court must consider the change clause—a provision in the same agreement that contains the arbitration clause—when deciding whether an agreement to arbitrate was formed. ECF 15, at 2–3.

at 657–58; *Holloman v. Circuit City Stores, Inc.*, 894 A.2d 547, 549–50 (Md. 2006); *Bailey*, 2023 WL 6244591, at *5–6; *Coady*, 32 F.4th at 292; *Caire*, 982 F. Supp. 2d at 594; *Mbongo v. Robinhood Markets, Inc.*, No. 714, Sept. Term, 2021, 2022 WL 621797, at *7 (Md. App. Ct. Mar. 3, 2022). Other times, courts consider a clause that generally applies to the broader contract even though the clause is not expressly connected to the arbitration clause. *See, e.g.*, *Harby*, 915 A.2d at 464, 468–69; *Johnson*, 2023 WL 5804281, at *5.

While the Maryland Supreme Court has not addressed whether courts should consider a clause that generally applies to the entire contract as part of the parties' agreement to arbitrate when the arbitration clause does not expressly incorporate that extrinsic clause, the Maryland Appellate Court has. In *Harby*, a child's mother signed a contract when she opened an account at a bank for him. *Id.* at 463–64. The agreement included an arbitration clause. *Id.* at 464. The agreement also included a clause reserving to the bank the right to change any of the terms of the agreement. *Id.* at 468–69. The arbitration clause did not expressly refer to the change clause. *See id.* at 464. Nor did the change clause expressly refer to the arbitration clause. *See id.* at 468–69. The two provisions were connected in one way only: The change clause applied to the entire contract. *See id.* For that reason alone, the Maryland Appellate Court treated the change clause as part of the parties' agreement to arbitrate. *See id.* at 470–71.

As the word of Maryland's intermediate appellate court, *Harby* is entitled to this Court's respect. *See Liberty Mut. Ins. Co. v. Triangle Indus., Inc.*, 957 F.2d 1153, 1156 (4th Cir. 1992). Of course, the "best evidence" of the answer to a question of state law is what the state's highest court has said about the question. *See id.* Nevertheless, when, as here, the state's highest court has not answered a question of state law, a federal district court sitting in diversity must look to the rulings of the state's intermediate appellate court as "the next best indicia of what state law is." *See id.*

(quoting 19 Charles A. Wright, Arthur R. Miller & Edward H. Cooper *Federal Practice & Procedure* § 4507, at 94–95 (1982)). "[O]nly if the decision of a state's intermediate court cannot be reconciled with state statutes, or decisions of the state's highest court, or both, may a federal court sitting in diversity refuse to follow it." *Assicurazioni Generali, S.p.A. v. Neil*, 160 F.3d 997, 1003 (4th Cir. 1998). A federal court's sense that "the intermediate court's decision was wrong, bad policy, or contrary to the majority rule in other jurisdictions" is not reason enough to reject it. *Id.*

Whatever this Court might think about *Harby*'s approach, it is compatible with the most relevant decisions of the Maryland Supreme Court, *Cheek v. United Healthcare of the Mid-Atlantic, Inc.*, 835 A.2d 656 (Md. 2003), and *Holloman v. Circuit City Stores, Inc.*, 894 A.2d 547 (Md. 2006). In those decisions, the Maryland Supreme Court found that change clauses expressly applicable to arbitration clauses were part of the parties' agreements to arbitrate and weighed their impact on whether an agreement to arbitrate had been properly formed. *See Cheek*, 835 A.2d at 662; *Holloman*, 894 A.2d at 553–55. The fact that the Maryland Supreme Court found that change clauses within the arbitration clause, as in *Cheek*, 835 A.2d at 658, or expressly referring to the arbitration clause, as in *Holloman*, 894 A.2d at 550, form part of the arbitration agreement does not imply that the Maryland Supreme Court would not find, as *Harby* did, that change clauses that apply to the entire contract are part of the arbitration agreement. The Maryland Supreme Court did not have the latter issue before it. *Cf. Cheek*, 835 A.2d at 657–58; *Holloman*, 894 A.2d at 549–50. *Harby* is compatible with *Cheek* and *Holloman*.

True, *Cheek* cautioned that courts should not "go beyond the confines of the arbitration agreement itself and into an analysis of the validity of the larger contract." *Cheek*, 835 A.2d at 664. But *Harby* does no such thing. *Harby* does not analyze the validity of the larger contract. *Harby*

does not conflate the larger contract with the agreement to arbitrate. *Harby* simply recognizes the reality that a change clause in the broader contract that applies to the arbitration clause should be treated as part of the parties' agreement to arbitrate. *See Harby*, 915 A.2d at 468–70; *see also Bailey*, 2023 WL 6244591, at *5 (warning against "conflat[ing] the arbitration *provision* and the arbitration *agreement*," because "a change-in-terms provision specifically declaring its applicability to an arbitration provision that is part of the same underlying contract is incorporated into the arbitration agreement").

Reinforcing that conclusion, another court in this district recently proceeded as *Harby* did in a similar case. *See Jones v. Prosper Marketplace, Inc.*, No. GJH-21-1126, 2022 WL 834210, at *14–15 (D. Md. Mar. 21, 2022), *recons. denied*, No. JKB-21-893, 2023 WL 2771982 (D. Md. Apr. 4, 2023). The question was whether the contract's change clause could properly be considered part of the parties' agreement to arbitrate, even though the change clause was located outside the four corners of the arbitration clause. The change clause provided, in relevant part, that the defendant had "the right to change any term or provision of this Agreement or [the defendant's] Terms and Conditions." *Id.* at *14. The court held that it could consider the change clause. *Id.* at *14–15. As the court explained,

> The modification provision clearly applies to the arbitration agreement. [The defendant] retained for itself the "right to change any term or provision of this Agreement" at will. By stating that [the defendant] reserved the right to change any provision of "this Agreement," the modification provision also reserves the ability to modify the arbitration provision, a provision literally within "this Agreement."

*Id.* at *15.

The *Jones* approach is persuasive. Where an arbitration clause is contained within a broader agreement, the most reasonable way to determine whether the parties entered into an agreement to arbitrate is to read the entirety of the document and to take account of clauses that apply to the entirety of the agreement. *See Credible Behavioral Health*, 220 A.3d at 312 (stating Maryland

courts "construe contracts as a whole, to interpret their separate provisions harmoniously, so that, if possible, all of them may be given effect"). To be sure, one court has found this approach foreclosed by Maryland law. *See Cherdak v. ACT*, *Inc.*, 437 F. Supp. 3d 442, 458 (D. Md. 2020). That position has the virtue of cleanly distinguishing what courts may consider in this inquiry from what they may not. Nevertheless, most courts have concluded that if a change clause applies to an arbitration clause, the change clause is part of the arbitration agreement. *See Johnson*, 2023 WL 5804281, at *5 (collecting cases). Even if a court may not reach into separate documents for clauses the arbitration clause does not refer to, *see Cherdak*, 437 F. Supp. 3d at 458, it does not follow that a court may not consider the generally applicable terms of the same document, *see Jones*, 2022 WL 834210, at *14–15.

Applying these principles to the case at hand, the parties are correct that the change clause is part of the arbitration agreement. The provision says, in relevant part: "Subject to the limitations of applicable law, we may, at any time, change or remove any of the terms and conditions of, or add new terms and conditions to, this Agreement." ECF 9-4, at 3–4. The applicable definition of "Agreement" is: "Your contract with us for your Account, which is composed of your application, and the Account opening disclosures and this Account Agreement." ECF 9-4, at 2. The change clause plainly applies to the arbitration clause—a component of "this Account Agreement"—so the Court may consider its effect on formation. *See Harby*, 915 A.2d at 468–70; *Jones*, 2022 WL 834210, at *15.

True, the arbitration clause does not explicitly refer to the change clause or to any other clause from the Credit Agreement. *Cf. Cheek*, 835 A.2d at 658; *Holloman* 894 A.2d at 549–50. Nevertheless, the arbitration clause cannot be properly understood in complete isolation from the rest of the contract. *See Johnson*, 2023 WL 5804281, at *5–6. For example, without reading the

arbitration clause in its contractual context, there would be no way to establish that Ford ever accepted the arbitration agreement because the arbitration clause contains no mechanism for acceptance. It is also true that the Fourth Circuit once declined to consider a change clause outside an arbitration clause as part of the parties' agreement to arbitrate. *See Hill v. Peoplesoft USA, Inc.*, 412 F.3d 540, 544 (4th Cir. 2005). But that was because the arbitration agreement was a stand-alone, independently executed document. *Id.* Here, the arbitration clause is part and parcel of the overarching Credit Agreement that the change clause governs. So the change clause is part of the parties' agreement to arbitrate, even though it is located outside the arbitration clause.

That brings us to the heart of the dispute. Ford argues that the change clause renders the defendants' promise to arbitrate illusory. His argument rests on the Maryland Supreme Court's decision in *Cheek v. United Healthcare of the Mid-Atlantic, Inc.*, 835 A.2d 656 (Md. 2003). In *Cheek*, the plaintiff sued his employer for breach of contract after he was fired. *Id.* at 657. His employer moved to compel arbitration, citing two documents: a provision of the Employee Handbook that provided for the arbitration of all employment disputes, and a form the plaintiff signed acknowledging the contents of the Handbook and its arbitration policy. *Id.* at 657–58. However, the arbitration policy in the Handbook contained a change clause that reserved to the employer the right to alter, amend, or revoke the arbitration policy at any time, with no substantive or procedural limitations on the exercise of that right. *Id.* at 658. The Maryland Supreme Court held that the change clause rendered the employer's promise to arbitrate illusory: "words in a promissory form that promise nothing." *Id.* at 662 (quoting Corbin on Contracts § 5.28 (2003)). Because the employer had provided the plaintiff "no real promise," the employer had provided no consideration for the parties' agreement to arbitrate, *id.*, and the agreement could not be enforced, *id.* at 669.

Three years later, the court elaborated on *Cheek* in *Holloman v. Circuit City Stores, Inc.*, 894 A.2d 547 (Md. 2006). Like the employment agreement in *Cheek*, the employment agreement in *Holloman* contained an arbitration clause and a change clause. *See id.* at 549–50. Under the change clause, the employer retained the ability to change the arbitration clause "on December 31 of any year upon giving 30 calendar days written notice" to employees. *Id.* at 550. These procedural limitations, absent from the agreement in *Cheek*, made a difference. Because the employer remained "bound to the terms of the arbitration agreement for 364 days, [had to] provide thirty-days notice prior to any modification and [could] only alter the agreement on a single day out of the year to become effective during the next day," the Maryland Supreme Court held that the employer had made a binding promise that was not illusory. *Id.* at 554.

The question here, then, is whether the change clause in the Credit Agreement renders the defendants' promise to arbitrate illusory. Applying the language in the change clause to the arbitration clause means the defendants "may, at any time, change or remove" the terms and conditions of the arbitration clause, including their promise to arbitrate. *See* ECF 9-4, at 3–4. Because the defendants thus reserved the right to amend or revoke their promise to arbitrate "at any time," that promise is illusory and is not sufficient consideration to support an arbitration agreement—unless there is some limitation on their authority to change the agreement. *See Cheek*, 835 A.2d at 662; *Johnson*, 2023 WL 5804281, at *7; *Bailey*, 2023 WL 6244591, at *7.

The defendants argue the change clause contains such a limitation. On their account, the change clause does not render the promise to arbitrate illusory because the change clause is "subject to the limitations of applicable law." ECF 15, at 3 (quoting ECF 9-4, at 3–4). According to the defendants, this provision is a substantial limitation on their discretion because the choice-of-law clause provides that "applicable law" is federal and Utah law. *Id.* at 5–8. And under those

laws, their authority to change the arbitration agreement is limited, and their promise to arbitrate, therefore, is not illusory.

Of course, the defendants' argument is sound only if the choice-of-law clause is part of the arbitration agreement as well. There are at least two reasons to think that it is: The change clause refers to "applicable law" and the choice-of-law clause is a generally applicable provision in the wider contract. ECF 9-4, at 4 (stating the choice-of-law clause applies to "this Agreement").[3] However, while there is authority for importing change clauses found outside an arbitration clause into the arbitration agreement, *see, e.g.*, *Johnson*, 2023 WL 5804281, at *5, the Court is aware of no decisions relying on external choice-of-law clauses to determine whether the parties formed an arbitration agreement. That absence of authority weighs against taking this step. Fortunately, the Court does not have to decide whether it may consider the choice-of-law clause in determining whether the parties formed an arbitration agreement. Whether the Court considers the choice-of-law clause or not, the promise to arbitrate is illusory. So the Court need not and does not decide whether the choice-of-law clause is part of the arbitration agreement.

If the choice-of-law clause is not part of the arbitration agreement, then the phrase "applicable law" in the change clause must be defined without reference to the choice-of-law clause. But the change clause supplies no definition of that phrase. *See* ECF 9-4, at 3–4. That leaves the Court with two ways to interpret "applicable law." Perhaps "applicable law" means nothing at all. If "applicable law" does not mean anything, then it certainly does not restrict the

---

[3] The choice-of-law clause begins with, "Except as expressly set forth in the Arbitration of Disputes Provision in the Agreement . . . ." ECF 9-4, at 4. The only part of the arbitration clause the choice-of-law clause could be referring to reads, "The arbitration award shall award only such relief as a court of competent jurisdiction could properly award under applicable law[.]" *See id.* That provision is immaterial here. Otherwise, nothing in the arbitration clause or the Credit Agreement restricts the applicability of the choice-of-law clause to the arbitration clause.

defendants' power under the change clause to modify or revoke their promise to arbitrate. So the defendants' promise to arbitrary is illusory. Alternatively, "applicable law" might mean the law of the state in which the contract was formed. *See Francis v. Allstate Ins. Co.*, 709 F.3d 362, 369 (4th Cir. 2013). Here, that means Maryland law. *See* ECF 2, ¶ 119. The Court can find no Maryland statute—and defendants point to none—that restricts the defendants' ability to change the arbitration agreement. And a phrase like "applicable law" does not encompass case law. *See Johnson*, 2023 WL 5804281, at *7. So again, the defendants' promise to arbitrate is illusory.

To be sure, *Holloman* held that a change clause that afforded the defendant some discretion to modify the arbitration clause did not render the promise to arbitrate illusory. *Holloman v. Circuit City Stores, Inc.*, 894 A.2d 547, 553–55 (Md. 2006). But there, unlike here, the change clause explicitly detailed an elaborate and restrictive process for a change to take effect. *Id.* The vastly more general phrase "subject to the limitations of applicable law" cannot reasonably be read to supply anything like the procedural constraints in *Holloman*. *Cf. Dumbarton Imp. Ass'n, Inc. v. Druid Ridge Cemetery Co.*, 73 A.3d 224, 232 (Md. 2013) (stating contractual interpretation requires the court to "determine from the language of the agreement itself what a reasonable person in the position of the parties would have meant at the time it was effectuated"). If the contract does not define "applicable law," then the defendants' promise to arbitrate is illusory because Maryland law does not restrict their ability to revoke their promise to arbitrate by exercising their power under the change clause. *See Cheek*, 835 A.2d at 662.

If the choice-of-law clause is part of the arbitration agreement, the result is the same, but the rationale is different. According to the defendants, "applicable law" is the law identified in the choice-of-law clause: federal law and Utah law. *See* ECF 15 at 3 ("Given the choice-of-law

provision it should be clear what applicable law is referenced in the [change] clause."). The phrase does appear in the choice-of-law clause, but the complete context bears repeating:

> Except as expressly set forth in the Arbitration of Disputes Provision in the Agreement, this Agreement and the interpretation and enforcement thereof (including but not limited to the exportation of interest rates) will be governed by Federal law *that applies to us*, and to the extent not preempted by Federal law, the laws of the State of Utah, without regard to its conflicts of law provisions and principles. If there is any conflict between any of the terms and conditions of this Agreement and *applicable Federal or State law*, this Agreement will be considered changed to the extent necessary to comply with *the applicable law*.

ECF 9-4, at 4 (emphasis added). There are two ways to read the choice-of-law clause. The first is that the choice-of-law clause defines only "governing law"—the title of the clause—and has nothing to say about the meaning of "applicable law," a term the clause invokes but does not define.[4] The Court has already discussed the possibility that the Credit Agreement does not define "applicable law" and found that it is no help to the defendants.

The second possibility—the approach the defendants recommend—is that "applicable law" means "governing law" (or at least whichever subset of governing law, federal or Utah law, is relevant to a given issue), so the change clause is "subject to the limitations" of federal and Utah law. *See* ECF 15, at 3. On this interpretation, the choice-of-law clause defines "applicable law" to mean federal law and, to the extent not preempted, Utah law. ECF 15, at 5–7. According to the defendants, that preserves their promise, because the Truth in Lending Act ("TILA"), 15 U.S.C. § 1637(i)(2); the Utah statute of frauds, Utah Code Ann. § 25-5-4; and the Utah Arbitration Act, Utah Code Ann. § 78B-11-101 *et seq*., meaningfully restrict their ability to change the arbitration

---

[4] One reason to think the choice-of-law clause does not define what "applicable law" means throughout the contract is that the phrase "applicable law" appears in the arbitration clause, and as the Court observed in the previous footnote, the choice-of-law clause expressly does not apply to that appearance of "applicable law." *See* ECF 9-4, at 4.

clause. ECF 15, at 5–7; ECF 21, 4–5. However, the defendants' arguments are unavailing. These statutes do not make the defendants' promise to arbitrate sufficiently definite.

Start with federal law. 15 U.S.C. § 1637(i)(2) requires credit card issuers to "provide a written notice of any significant change . . . in the terms [of a credit card agreement]," including any increase in fee, at least 45 days before the change takes effect. To give effect to this mandate, Regulation Z, 12 C.F.R. § 1026.9(c)(2)(i)(A), requires issuers to send written notice of a significant change in account terms "to each consumer who may be affected . . . at least 45 days prior to the effective date of the change." *Id.* A "significant change in account terms" is a "change to a term required to be disclosed under [12 C.F.R.] § 1026.6(b)(1) and (b)(2), an increase in the required minimum periodic payment, a change to a term required to be disclosed under § 1026.6(b)(4), or the acquisition of a security interest." 12 C.F.R. §1026.9(c)(2)(ii). The terms subject to the notice requirements do not include the terms of arbitration clauses. *See id.*; *id.* § 1026.6(b). Thus, neither TILA nor its implementing regulations require credit card issuers to provide advance notice of changes to the dispute resolution process. As a result, the defendants' promise to arbitrate remains illusory even if it were subject to federal law.

Next, consider Utah law. The defendants argue that under Utah's statute of frauds, Utah Code Ann. § 25-5-4, both parties must agree to any changes to the arbitration clause and neither party may unilaterally make a change. *See* ECF 15, at 5–7. But the defendants assume, rather than establish, that the statute of frauds applies to the arbitration agreement. *Id.* at 6–7 (discussing § 25-5-4's application to the arbitration agreement). Consider the relevant statutory text:

> (1) The following agreements are void unless the agreement . . . is in writing, signed by the party to be charged with the agreement:
>     . . .
>     (f) every credit agreement.
>
> (2)(a) As used in Subsection (1)(f) . . . :

(i)(A) "Credit agreement" means an agreement by a financial institution to:
(II) otherwise extend credit; . . .

(e) A credit agreement is binding and enforceable without any signature by the party to be charged if:
(i) the debtor is provided with a written copy of the terms of the agreement;
(ii) the agreement provides that any use of the credit offered shall constitute acceptance of those terms; and
(iii) after the debtor receives the agreement, the debtor, or a person authorized by the debtor, requests funds pursuant to the credit agreement or otherwise uses the credit offered.

Utah Code Ann. § 25-5-4. The statute defines a credit agreement as: "an agreement by a financial institution to: (I) lend, delay, or otherwise modify an obligation to repay money, goods, or things in action; (II) otherwise extend credit; or (III) make any other financial accommodation." Utah Code Ann. § 25-5-4(2)(a)(i)(A). That definition does not include an arbitration agreement. While the statute of frauds clearly applies to credit agreements, nowhere does the statute provide that it applies to arbitration agreements. *See id.* And the defendants cite no authority for the proposition that the Utah statute of frauds applies to arbitration agreements.

The Utah statute of frauds only applies to the parties' agreement to arbitrate if the Court may take account of the fact that the agreement to arbitrate is part of a credit agreement. At this stage—assessing whether an arbitration agreement was formed—the Court may not do that. Even an "implicit determination about the nature" of the overarching agreement is prohibited. *See Cheek*, 835 A.2d at 665; *see also Coady*, 32 F.4th at 291 ("We may examine 'only the language of the arbitration agreement itself.'") (quoting *Hill*, 412 F.3d at 543). Because at this stage the Court cannot see the arbitration agreement as part of a credit agreement, the Court must conclude that the Utah statute of frauds does not apply. In consequence, the Utah statute of frauds does not limit the defendants' capacity to modify or revoke their promise to arbitrate. Their promise is illusory, and the arbitration agreement is thus without consideration. *See Cheek*, 835 A.2d at 662.

The defendants also cite the Utah Supreme Court's decision in *Pacific Development, L.C. v. Orton*, 23 P.3d 1035 (Utah 2001) for the proposition that "Utah law also provides an arbitration agreement must be in a writing agreed to by the parties." ECF 21, at 4. *Orton*'s holding does not reach that far here. In *Orton*, the parties to a written arbitration agreement entered arbitration to resolve a dispute. *Orton*, 23 P.3d at 1037. But at the arbitration, they presented evidence to the arbitrator on a question that their original agreement expressly excluded from the scope of the arbitration process. *Id.* at 1037, 1039. Afterwards, the party that lost on that issue moved to vacate or modify the award as beyond the arbitrator's powers. *Id.* at 1037. The issue that reached the Utah Supreme Court was whether under the Utah Arbitration Act, Utah Code Ann. § 78B-11-101 *et seq.*, "a written arbitration agreement may be implicitly modified merely by the parties' actions." *Id.* at 1040. The Utah Supreme Court held that, because the Utah Arbitration Act requires that "arbitration agreements, unlike ordinary contracts, . . . be contained in a written document setting forth the scope of the dispute to be arbitrated," *id.* at 1039, their scope cannot be modified by the parties' subsequent conduct alone, but only by a subsequent bilateral writing, *id.* at 1040.

The defendants conclude from *Orton* that "under Utah law [a] modification must be agreed to by both parties to the contract, and unilateral changes are not allowed." ECF 21, at 4–5. *Orton* does not warrant that conclusion. The fact that the parties to a written arbitration agreement without a change clause may not modify the scope of that agreement by their conduct alone does not imply that a party to a written arbitration agreement with a clause that authorizes that party to change the agreement at will may not change it except with the further consent of the other party. *Orton* did not consider, much less hold, that the Utah Arbitration Act requires a party exercising its contractual power to modify an arbitration agreement to obtain the consent of the other to the

change. And in fact, the statute is silent on that question. *See generally* Utah Code Ann. § 78B-11-101 *et seq*.

Orton does not even stand for the proposition that Utah law requires every change to an arbitration agreement to be in writing. In *Createrra, Inc. v. Sundial, LC*, 304 P.3d 104 (Utah Ct. App. 2013), one party to an arbitration agreement contended that an oral modification to the agreement was invalid because *Orton* held that "any modification to an arbitration agreement must also be in writing." *Createrra*, 304 P.3d at 107. The Utah Court of Appeals rejected that contention, holding that *Orton* must be construed narrowly to cover only "modification of the scope of an arbitration agreement." *Id.* at 108. In addition, the court emphasized that because "the terms of the operating agreement itself [did] not preclude the parties from modifying it," and in fact the agreement expressly contemplated amendments, *Orton*'s strictures did not apply. *Id.* at 109. This Court cannot accept the defendants' invitation to extend *Orton* ever farther than Utah's own courts have already declined to stretch it. The upshot is simple: Utah law does not limit the defendants' ability to exercise their contractual power to change the arbitration agreement. So their promise to arbitrate is illusory.

Putting these pieces together, there are two ways to read the phrase "applicable law" in the change clause. If the contract does not define that use of "applicable law," then "applicable law" is the law of Maryland. The law of Maryland does not restrict the defendants' power to change the arbitration agreement enough to prevent the change clause from rendering their promise to arbitrate illusory. So the promise is illusory. If the contract defines "applicable law" as "governing law," then "applicable law" is federal law and Utah law. Utah law imposes, at most, a requirement that the initial arbitration agreement be in writing. That does not constrain the defendants' power to modify or revoke their promise to arbitrate. So again, the promise is illusory. The Court need not

disambiguate "applicable law," because under either reading, the defendants' promise to arbitrate is illusory.

**IV.     Conclusion**

      Maryland law governs whether the parties formed an agreement to arbitrate. Under Maryland law, an agreement to arbitrate is enforceable only if, among other things, the agreement is supported by consideration. Here, the only consideration for the agreement to arbitrate is the mutual promise of the parties to resolve their disputes this way. However, the defendants' promise to arbitrate is illusory because the change clause reserved for them the right to modify or revoke that promise with no limitations. So there was no consideration for the agreement to arbitrate and the agreement is not enforceable. Accordingly, the motion to compel arbitration, ECF 9, is denied. A separate order follows.

March 28, 2024
Date

Deborah L. Boardman
United States District Judge